Fuld, J.
The question for decision, one of first impression in this court, is this: Does the New York Automobile Assigned Risk • Plan of insurance, which in explicit terms provides only for prospective cancellation, abrogate the insurer’s common-law right to void a policy from its inception on the ground that it had been obtained through fraud or misrepresentation?
The facts are undisputed. In his application for insurance under the New York Automobile Assigned Risk Plan, Thomas O’Connor falsely stated that he had not been convicted of any non-vehicular offense within the preceding three-year period. He had actually been twice convicted of disorderly conduct and twice of public intoxication, a fact which rendered him ineligible for insurance under the Plan. Following its execution, 0 ’Con-nor’s application was forwarded to the Assigned Risk Plan which assigned the risk to the Aetna Casualty and Surety Company. The latter, relying on O’Connor’s misrepresentation, issued a policy for one year on June 8, 1955 and, shortly thereafter, it conducted an investigation which failed, however, to uncover the prior convictions.
On March 4, 1956, while the policy was still in force, O’Con-nor’s automobile was involved in an accident causing damage to a car belonging to Millie Hamilton and personal injuries to Perley Hamilton. Receipt of a report of the accident initiated an investigation during the course of which Aetna discovered the existence of the insured’s four prior convictions. It thereupon informed the Hamiltons that it would decline coverage on the policy and notified O’Connor that it elected to rescind his policy, to void it from its inception. This action, in which O’Connor and the Hamiltons were joined as defendants, was then brought by Aetna for a declaratory judgment. The courts below decided the case in favor of the defendants, holding that, although the insurer had the right to cancel under the Plan, it did not have the right to rescind.
*362 The ease obviously turns on the construction to be accorded the Plan. And such construction calls not for the mechanical application of overly abstract principles of statutory interpretation, but rather for a painstaking reading of the Plan in the light of the circumstances surrounding its adoption. If the Plan bespeaks a design to provide a detailed and comprehensive set of regulations governing the rights and liabilities of the parties entering into assigned risk insurance contracts, the carrier may not void the policy from its inception since that remedy is not provided by the Plan. If, on the other hand, the Plan is merely a collection of separate provisions, covering but a few unrelated aspects of the legal relation between carrier and insured, then, it may only be taken to supplement, not supplant, our common-law rules relating to insurance contracts, and in such case the insurer may rescind ab initio and be relieved of any liability on the policy.
In 1946, the Legislature faced the problem of making ‘' automobile bodily injury and property damage liability insurance available to motorists unable to obtain coverage through normal channels ” because of their status as “ poor risks”. (See Smith, The New York Automobile Assigned Risk Plan, appearing in vol. 4 of Examination of Insurance Companies, pp. 453, 456, published by the New York State Insurance Department in 1954; cf. California Auto. Assn. v. Maloney, 341 U. S. 105, 106-107.) Its solution, in section 63 of the Insurance Law, was an authorization to the Superintendent of Insurance to adopt, after consultation with insurers, a plan “ for the equitable apportionment among * * * insurers of applicants for such insurance who are in good faith entitled to but are unable to procure insurance through ordinary methods ’ ’, and to make participation in such a plan compulsory for all New York insurers.
The very condition for which the legislative remedy was sought and the very tenor of the statute authorizing the Plan provide initial indications of its comprehensive character. Manifestly, nothing would be gained by compelling insurance carriers to issue insurance to individuals otherwise unable to obtain a policy if the conditions under which the insurance could be cancelled or avoided were not also the subject of regulation. The compulsory character of the carrier’s participation in the *363 Plan and the very need for the legislation suggest a concern for the entire range of duties and obligations which comprise the assigned risk insurance contract instead of a concentration on isolated aspects of the contractual relationship.
The Plan itself furnishes a number of signposts pointing the same direction as do both the legislative background and the language of the statute. To begin with, and it is highly significant, the Plan is broad in scope, containing 22 sections, one devoted to a statement of its purposes (§1), another to its administration (§ 4), a third to the extent of coverage provided (§ 10) and others to the form of notice to applicants (§ 14), rates (§ 17), cancellations (§ 18), right of appeal (§19) and re-eligibility (§ 20). The very range of the subjects included reflects a design to supply an exclusive and comprehensive scheme of regulation of the contractual relationship concerned.
Furthermore, turning to the specific issue involved on this appeal, we find that a number of the individual provisions of the Plan imply an intention to limit the insurer, if fraud and misrepresentation be charged, to the right to cancel on 10 days’ notice as specified in section 18,[1] an intention, in other words, to abrogate the common-law right to rescind on the ground of fraud or misrepresentation. Section 1 of the Plan, for instance, describes its purposes as being “ To make automobile bodily injury and property damage liability insurance available subject to the conditions hereinafter stated.” Had the right to cancel been considered a mere supplement to the insurer’s common-law right of termination instead of an exclusive remedy, the drafters of the Plan would hardly have provided that liability insurance was being made available “ subject to the conditions hereinafter stated.”
The provisions of section 19, concerning the right to appeal, and of section 20, dealing with re-eligibility, lend further support to our conclusion. Section 19, in order to effectuate the legislative desire to compel insurers to provide insurance for those “ unable to procure [it] through ordinary methods ”, sets *364 up an elaborate system of appeal for “An applicant denied insurance or an insured given notice of cancellation of insurance under the Plan ”. It was obviously felt that the Plan would fail of its purpose unless administrative control and regulation of termination of insurance contracts, as well as of their issuance, were provided through a system of appeal. A right to an administrative appeal, however, is limited by the language of section 19 to “ an insured given notice of cancellation of insurance under the Plan ’ ’. It seems unreasonable, indeed, inconsistent with the Plan’s apparent policy, to suppose that, if assigned risk insurance could be rescinded as well as cancelled, only those parties whose insurance was cancelled would have the right to an administrative appeal. The limitation of appeal to a case where an insured is “ given notice of cancellation ” serves to confirm the conclusion that this right to cancel was designed as a substitute for, not an addition to, the common-law right of rescission. Likewise, the only reasonable explanation for the fact that, while section 20' of the Plan provides that ‘ ‘ An assigned risk cancelled under the provisions of the Plan shall not be eligible to reapply for assignment until 12 months after the effective- date of cancellation”, it is silent concerning re-eligibility in the case of termination not covered by the Plan, is that cancellation was intended to be the sole means of terminating such contracts of insurance.
That there is no right to rescind the assigned risk policy does not mean that the carrier is deprived of all reasonable redress against the insured who misrepresents material facts in order to obtain coverage, since the Plan expressly provides for cancellation under these circumstances. The effect of the Plan is to enforce upon the insurer the necessity to discover fraud at the earliest possible moment, before an accident occurs and the rights of innocent injured third parties have intervened. In this respect, the Plan merely reflects the oft-repeated legislative recognition that liability insurance is not the concern solely of the insured and his insurer. (See, e.g., Insurance Law, § 167, subd. 1, par. [d]; Vehicle and Traffic Law, § 345, subd. [i], par. [1]; Lauritano v. American Fid. Fire Ins. Co., 3 A D 2d 564, 567-568, affd. 4 N Y 2d 1028.)
Aetna did, in this case, actually conduct an early investigation of O’Connor and, if that investigation had been performed *365 properly, the insured’s misrepresentation would have been discovered and Aetna could have cancelled, pursuant to section 18 of the Plan, long before the Hamiltons were injured. While, therefore, Aetna may ultimately be held on a policy obtained by fraud, its liability is in a very real sense attributable to its own fault, and the true beneficiary is not the wrongdoer, but his innocent victims.
The judgment of the Appellate Division should be affirmed, with costs to respondents Hamilton.
Chief Judge Desmond and Judges Dye, Froessel, Van Voorhis, Burke and Foster concur.
Judgment affirmed.

. Section 18, entitled “Cancellations”, reads in part as follows:
"A earner which has issued a policy or binder under this Plan, shall have the right to cancel the insurance by giving notice as required in the policy or .binder if the insured * * •
“(4) has obtained the insurance through fraud or misrepresentation ”, ,