**AMERICAN FAMILY MUTUAL INSURANCE COMPANY,**
Plaintiff-Appellant,

v.

**Ricky L. BROWN, Linda (Dittmer) Brown, Michael R. Quimby and Leo Endel, Defendants-Respondents.**

No. WD34041.

Missouri Court of Appeals,
Western District.

July 5, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Aug. 30, 1983.

Application to Transfer Denied Oct. 18, 1983.

Edgar S. Carroll, Warrensburg, for plaintiff-appellant.

J. Kirk Rahm, Warrensburg, for defendants-respondents Brown.

Stephen W. Angle, Warrensburg, for defendants-respondents Quimby and Endel.

Before LOWENSTEIN, P.J., and WASSERSTROM and MANFORD, JJ.

WASSERSTROM, Judge.

American Family Mutual Insurance Company ("American Family") filed this suit to obtain a declaratory judgment that it has no liability to defendant Ricky L. Brown ("Ricky") against claims for personal injuries to Michael R. Quimby and Leo Endel or for the wrongful death of Nancy C. Quimby. From an adverse ruling from the trial court, sitting without a jury, American Family appeals.

On July 11, 1979, Ricky was driving a 1976 Pontiac Gran Prix owned by Linda Dittmer (Brown) ("Linda") and collided with a vehicle in which the Quimbys and Endel were occupants. Linda's Pontiac was covered by a policy issued by State Farm Mutual Insurance Company which has acknowledged liability to the limits of its policy. The insurance coverage question remaining pertains to the policy issued by American Family on a 1972 Chevrolet van owned by Ricky which was not operable on July 11, 1979, and which was not involved in the accident mentioned.

The American Family policy covered Ricky not only with respect to the Chevrolet van but also for his use of a "non-owned automobile" or "a temporary substitute automobile." Both of those quoted terms are defined in the policy to mean an automobile not owned by the named insured or any resident of the same household. American Family contends that the present case falls within that exclusion on the ground that Linda was a resident of the same

household as Ricky. That contention presents the narrow issue to be decided.

■ The determination of that issue must start with an acknowledgment that "resident of the same household" is a phrase subject to variable interpretation depending on the facts of each particular case. As stated in *Cobb v. State Security Insurance Co.,* 576 S.W.2d 726 l.c. 738 (Mo. banc 1979): " 'Household' is a chameleon like word. The definition depends on the facts of each case." And as stated in *Giokaris v. Kincaid,* 331 S.W.2d 633, l.c. 641 (Mo.1960): "The word 'family,' synonymous with 'household,' is of varied signification and may have a narrow or broad meaning."

■ Moreover, where this phrase appears in an exclusionary clause, as here, the burden of proof is on the insurer and if reasonably possible the clause will be construed so as to afford coverage. As held in *Giokaris v. Kincaid, supra,* quoting from prior authority:

> "[A]n insurance policy, being a contract designated to furnish protection, will, if reasonably possible, be construed so as to accomplish that object and not to defeat it. Hence, if the terms are susceptible of two possible interpretations and there is room for construction, provisions limiting, cutting down, or avoiding liability on the coverage made in the policy are construed most strongly against the insurer."

The *Giokaris* decision went on to hold:

> "Mindful that insurance policies are to be construed, if reasonably possible, to accomplish the designated protection, and provisions avoiding liability on the coverage afforded are construed most strictly against the insurer, we conclude the facts of record did not exclude garnishee's liability as a matter of law...."

■ Subject to the foregoing qualifications, the Missouri courts have developed twin tests to be applied in the application of this insurance clause. One criterion looks at the length of time the parties intended to remain together and whether the arrangement is permanent or temporary. The other standard focuses on the functional character of the arrangement or whether the parties function as a family unit under one management. *Cobb v. State Security Insurance Co., supra* at 738, and cases there cited.

With these general principles in mind, we now turn to the evidence bearing on this issue which was taken at the original trial of this case held in June 1980. Linda testified that she and Ricky were married on October 6, 1979. The matter of marriage had not been discussed between them at all until about a month before it took place, when the decision to marry was reached. The two had known each other for about 10 years, and had started dating in 1976, at which time and in 1977, Linda was living in a farm home with her mother on Rural Route 3, Concordia, Missouri. Ricky, during those two years, rented a residence three miles south of Sweet Springs, Missouri, from Robin Deke. Linda, although occasionally staying overnight, did not reside there. Ricky lived in the Deke house seven days a week. In September, 1977, Linda purchased a mobile home and had it moved onto her mother's farm, which was rented from the mother's brother-in-law. Linda purchased a homeowner's policy on the mobile home, which sat vacant for two or three months until Linda could have concrete runners poured for it, and she moved into it in December, 1977. The mobile home had a separate LP gas source from her mother's home; the electricity, coming from the same pole, was paid for by her mother; but the cost of water was split between the two of them. The telephone was separate and was listed in Linda's name. Ricky started staying in the mobile home on December 25, 1977, and made and received telephone calls on Linda's individually listed telephone. Although he had his own furniture from the Deke residence, he did not move it into the mobile home but stored it elsewhere. At that time the two did not have any plans to marry, the situation was not then intended to be permanent, and Linda testified further that the subject of marriage was not brought up until about a month before the marriage, which was October 6, 1979.

After Ricky moved into Linda's mobile home his mail was delivered to the farm mailbox. He kept up the maintenance on the mobile home and paid one-half of the gas and phone bills. Each of the two kept up the expenses on their separately owned automobiles. The cost of groceries was split, the two shared cooking and dishwashing chores, and they entertained mutual friends in the home. Ricky kept his clothing in the mobile home but in a separate room from the bedroom. They shared the same bed in the one bedroom. No household items were then purchased by the pair—the household goods were owned by Linda. Each had separate checking accounts, and neither purchased clothing for the other.

At the time of the collision, Linda gave Ricky permission to drive the Gran Prix which was involved in the collision. Each paid for the gasoline, insurance and maintenance on their separate vehicles, and when Ricky borrowed hers, he put gasoline in it. Before the marriage, Ricky came and went as he wanted to, staying out at all hours, but afterward, he asked Linda if it was all right if he went out.

These further changes occurred after the couple married: The telephone listing was changed to Ricky's name. Their clothing was combined in the same bedroom closet. Ricky offered some of his furniture for sale after the marriage, and then brought some of it into the mobile home, replacing some of Linda's which was not in good shape. All clothing and other expenses were paid from joint checking account created after the marriage, and Ricky took more responsibility for helping in the household duties and chores.

Linda testified further: "Q I am referring to the period now up to the accident of July 11th. A Yes. Q Did you consider you and Rick's staying in the house, living together in the house, to be a permanent or temporary situation? A Temporary."

American Family offered to prove at the 1980 trial that on July 13, 1979, two days after the collision, an adjuster for State Farm Mutual Insurance Company, which extended coverage to Ricky by reason of his use of Linda's car by her permission, took a statement from Linda. That statement by Linda in part contained this: "Q Okay, now Rick Brown, could you identify him for us? A He is my boyfriend ah, he lives—we've lived together for about a year and a half now and ah, *we're going to be married pretty soon.* Q Okay, now you live together in ah—A In a trailer. Q Okay, at Route 3, Concordia, Missouri? A Yes, un huh." [Italics added.]

The trial court refused to accept in evidence a transcript of that statement made by Linda to the adjuster, on the theory that the statement was excludable either under an attorney client privilege or as work product. After having received and considered all the rest of the evidence outlined above, the trial judge entered a memorandum opinion holding in part as follows:

"It is elemental that in exclusionary clauses in insurance policies the insurer has the burden of proving the facts of the case comes within the exclusion and where there are two interpretations the one cutting down or limiting coverage will be construed strongly against the insurance company.

It is the considered opinion of this Court that the plaintiff has not met the burden of proving Ricky and Linda were residents of the same household. While it is true they were residents of the same house, but when the word 'household' is used in the policy this term takes on a far greater and broader meaning. It takes on a social meaning and it connotes living together as a family unit. The length of time the parties intend to remain in the home and whether it is temporary or permanent is of great importance. Here the plaintiff has failed to prove the arrangement was permanent in nature. Additionally, the plaintiff has failed to carry its burden of proving the two were living together as a family unit under one management. . . .

Without further lengthening this opinion, the Court holds and declares Ricky and Linda were not residents of the same

household within the meaning of the exclusionary clause of the policy and plaintiff is legally obligated to represent and defend Ricky and to pay any judgments against him within the terms of the policy arising out of the accident of July 11, 1979."

On an appeal from that order reported in *American Family Mutual Insurance Co. v. Brown*, 631 S.W.2d 375 (Mo.App.1982), this court tacitly approved the trial court's legal analysis of the facts as being in accord with controlling case law, but we found error with respect to the exclusion of the extra judicial statement given by Linda to the State Farm adjuster. In that respect, the opinion of this court stated at page 378:

"The trial court erred in excluding Linda's extra judicial statement because it bore upon the credibility of her trial testimony. The statement that she and Ricky were going to be married pretty soon, given near the time of the accident, contradicted her trial version that the arrangement was then temporary, and the subject of marriage was not discussed between them until about a month before the marriage. The temporary or permanent nature of the relationship was a crucial issue in the case, as a matter of *intention* of the parties, the evidence of which is to be taken with all the other facts and circumstances in the case by the trier of the fact...."

We then proceeded to remand this case to the trial court for the purpose of considering Linda's extra judicial statement and to determine her credibility in light thereof. In this respect our opinion stated at 631 S.W.2d l.c. 378:

"The matter of credibility of a witness is one within the exclusive province of the trier of the fact, here the trial court ... Here, the judgment must be reversed with directions that the trial court admit Linda's prior recorded statement, and for further hearing of testimony from her with respect to her giving of the statement, and her explanation, if any [see *Rotundo v. Fischlowitz*, 428 S.W.2d 581 (Mo.1968); and *Aboussie v. McBroom*, 421 S.W.2d 805 (Mo.App.1967)], of the statement that she and Ricky soon planned to marry. In reconsidering its decision, the trial court may of course use all of the testimony received at its prior hearing which is now reduced to a transcript of that record, or further evidence if offered."

On June 30, 1982, the trial court did hold a further hearing pursuant to the mandate of this court. A transcript of Linda's extra judicial statement to the State Farm adjuster was received in evidence. Then Linda again took the stand and testified in pertinent part as follows:

"Q I would like to ask you if you recall specifically when it was that you had the discussion with Rick Brown that you were going to get married?

A I don't remember the date, as a date. I just remember it was very shortly after the accident. The accident pulled us closer together. I know it was just a day or two afterwards but the time is all messed up in my mind. I can't tell you.

Q Okay. What was it that made you think it was a later time rather than right after the accident?

A I just lost track of time. Everything was confused.

. . . . .

Q (By Mr. Rahm) I want to ask you what it was that you recall Rick Brown saying to you when he proposed marriage to you?

MR. RAHM: And I offer this, Your Honor, not for the truth of what it was that Rick said but for the context of the proposal itself.

THE COURT: Very well, go ahead.

THE WITNESS: He told me that— he said, 'I see that you've stuck by my side through all of this. You've never had a doubt in your mind about making me leave or anything.' He said, 'If that's the case, I think we ought to get married.'

. . . . .

Q Now are you telling the Judge then that the discussion that you and Rick had was between July 11th and July 13th?

A Yes.

Q So it had to be on the 11th, the day of the accident, or the 12th?

A Yes.

. . . . .

Q (By Mr. Carroll) So you gave those answers to those questions in June of '78 (sic)?

A Yes.

Q And were they true?

A Yes.

Q And—but I do understand, Mrs. Brown, you are telling the Court here today that you and Rick decided on July 11th or 12th of 1978—year of the accident—no, 1979. You are telling the Court here today that you and Rick decided to get married on July 11th or 12th, 1979?

A Yes.

Q Not late in 1979?

A Yes.

Q Did you change your mind somewhere along the way?

A I was just confused. The time all ran together and I was just confused about the exact timing of it."

After having received all of this additional evidence as mandated by this court, the trial court entered new judgment as follows:

"Now after receiving the prior extra judicial statement of Linda as bearing upon her credibility and after hearing her testimony on this date, the Court finds that the intentions of the parties to get married was formed after the accident which occurred on July 11, 1979, and that up to the time of the accident the living arrangement between Linda and Ricky was a temporary one and that Ricky was not a resident of the household at the time of the accident within the meaning of the exclusionary clause of the policy. In this day and age of the prevalence of unmarried couples living together, it appears to this Court that if the plaintiff insurance company intends to rely on this exclusionary clause to escape responsibility for defending an insured it should spell out more specifically what is meant by being residents of the same household.

Therefore, this Court continues to hold and declare that Ricky and Linda were not residents of the same household within the meaning of the exclusionary clause of the policy and plaintiff is legally obligated to represent and defend Ricky and to pay any judgments against him within the terms of the policy arising out of the accident on July 11, 1979."

■ In view of the chameleon like meaning which attaches to the phrase "resident of the same household" and the flexible standards established by the Missouri Supreme Court for the application of that clause, the evidence here could reasonably be considered by the fact finder as showing that Linda was not a resident of Ricky's household. *See Hicks v. Hatem,* 265 Md. 260, 289 A.2d 325 (1972); *Henderson v. State Farm Mut. Automobile Ins. Co.,* 59 Wis.2d 451, 208 N.W.2d 423 (1973). *Cf. Hunter v. Southern Farm Bureau Casualty Ins. Co.,* 241 S.C. 446, 129 S.E.2d 59 (1962); *Dairyland Ins. Co. v. Beekman,* 118 Ariz. 294, 576 P.2d 153 (1978). We impliedly so held in the prior appeal, and we remanded this case solely for the trial court to consider the impeaching extra judicial statement and to determine whether the trial testimony of Linda should still be believed in light of that impeachment. It was clearly implicit in our prior opinion that the trial judge was to be free to either believe or disbelieve Linda after having considered the impeaching material. His ultimate judgment was to believe Linda, and that choice was a matter which we held on the prior appeal would be within his "exclusive province as the trier of the fact." That determination by the trial judge is now binding upon us. Rule 73.01(c)(2).

The judgment is affirmed.

LOWENSTEIN, P.J., concurs.

MANFORD, J., dubitante.