FARM BUREAU TOWN AND COUN-
TRY INSURANCE COMPANY OF
MISSOURI, Plaintiff–Appellant,

v.

Robert FRANKLIN,
Defendant–Respondent,

and

Jerri Ann Vibbard,
Intervenor–Respondent.

No. 15570.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 12, 1988.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Oct. 3, 1988.

Application to Transfer Denied
Nov. 15, 1988.

R. Max Humphreys, Carson, Coil, Riley,
McMillin, Levine & Veit, P.C., Jefferson
City, for plaintiff-appellant.

Harry Rupert Stafford, Jr., Hartville, for
defendant-respondent

John C. Banning, Wohlner & Associates
and John D. Compton, Springfield, for in-
tervenor-respondent. ·

CROW, Presiding Judge.

Farm Bureau Town and Country Insur-
ance Company of Missouri ("Farm Bu-
reau") brought this action seeking a declar-
atory judgment that insurance policy num-
ber 414610 ("the policy") issued by it to
Robert Franklin and Becky Franklin on a
1972 Freightliner tractor and flatbed trailer
provided no coverage for Robert on any
claim arising from an accident February
20, 1986.  On that date Robert, while oper-
ating the tractor-trailer unit, was involved
in an accident, as a result of which inter-
venor Jerri Ann Vibbard filed suit against
Robert for personal injuries allegedly sus-
tained by her.

The trial court, hearing the instant action
without a jury, entered judgment declaring
that the policy provided coverage for Rob-
ert against damage claims arising from the
accident, and that Farm Bureau was
obliged to defend Robert against such
claims and to indemnify him for any dam-
ages which might be adjudged against him.
Farm Bureau appeals.

The coverage question hinges on endorsement 76 appended to the policy. It provided:

"In consideration of the premium paid for the policy to which this endorsement is attached, it is understood and agreed that the insured vehicle is to be used exclusively for the farm use of the named insured only. Any use of the vehicle for hire or in connection with any custom farming done by the insured or others, except in the occasional hauling of farm products for neighbors, voids the policy."

The scope of our review is established by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The trial court's judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Conflicts in the evidence were for the trial court to resolve, *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 483[3] (Mo. banc 1980), and in doing so the trial court was free to believe all, part or none of the testimony of any witness. *Id.* at 483[4].

Robert's testimony established that he resided on a 230-acre tract owned by his mother, that at the time of the accident he had about 35 cattle on the tract, and that he also had 35 to 40 horses there, as he runs a rodeo. Robert explained it was necessary to supply hay to his animals and that he had bought hay in Colorado and Nebraska, using the tractor-trailer unit to haul the hay from those sites to the tract. He added that during the period from October, 1985, to February, 1986, he had used the tractor-trailer unit to make four or five trips to Colorado hauling wood cleared from the tract. Each load had brought about $2,100, and he had carried hay on the return trips.

At the time of the accident Robert was en route to Kansas City hauling a load of "smashed cars" and "junk farm equipment," which he intended to sell to a company there that bought scrap metal. According to Robert, a number of "junk cars" had accumulated on the tract over the years. He and his mother, who also resided on the tract, recounted that they, along with Robert's two brothers, would buy old cars, try to fix them up, and drive them "until they died." Robert estimated that the greatest number of such cars ever situated on the tract at any one time was "forty-five, maybe, fifty."

Before hauling abandoned cars from the tract, Robert would "smash" them with a bulldozer. Using the tractor-trailer unit, Robert had hauled 26,140 pounds of "scrap cars" to the Kansas City scrap dealer in August, 1985, receiving $560.95 for the load. On February 14, 1986, six days before the accident, Robert, using the tractor-trailer unit, had hauled 27,200 pounds of such cars to the same dealer, receiving $655 for them. The load on the tractor-trailer unit at time of the accident weighed 26,340 pounds. Robert avowed those three occasions were the only times he had ever hauled junk cars.

Robert conceded he had no titles to any of the cars, and he acknowledged he did not file tax returns for the money he received from selling them. He also admitted he had once bought and sold cars when he had a "dealer license." He denied, however, that he had ever been in "the scrap salvage business," and he also denied that any of the cars had come from a body shop once operated on the tract by a cousin. He did confirm that once the cars ceased running he kept them because he "figured some day they might be worth some money."

Asked how many cars were still on the tract, Robert responded, "[P]robably six or seven or eight." Asked why he was hauling the "junk cars" and "obsolete farm equipment" off the tract, Robert replied: "Well, I was tryin' to clean my place up to get some more pasture. A bunch of junk cars don't look too good on a farm." He conceded that during the time period when the accident occurred, hauling and selling the scrap constituted probably half his income.

According to Robert, several years prior to the accident he had begun clearing the

tract of timber to get more pasture. He asserted he planned to use the proceeds from the trip of February 20, 1986, to buy grass to sow on the tract.

Robert's mother testified she "nagged" him to haul the cars away. She recalled: "I caught one calf with his foot in one of the old cars and I said, 'You got to do something with these old cars'. So he said, 'Well, I'll just junk 'em.' "

The trial court included findings of fact and conclusions of law in its judgment. The conclusions of law were:

"1. The phrase 'farm use' as used in Endorsement ... 76 of the ... policy ... is ambiguous since it is not defined in the policy and has varied meanings with no fixed legal definitions and there are no Missouri cases defining the phrase 'farm use.'

2. The removal of abandoned cars from pasture land was in the furtherance of a farming operation, and fell within the term 'farm use', being in pursuance of the profession of farming.

3. Defendant Robert Franklin's 'farm use' at the time of the collision on February 20, 1986, was not excluded from coverage under the policy ... issued by ... Farm Bureau ... and such use was within the coverage of said policy."

■ Farm Bureau presents two points on appeal, the first of which is:

"The trial court erred in finding that [Robert's] hauling of scrap automobiles to Kansas City on his truck constituted a farm use because the finding was against the weight of the evidence, in that as a matter of law the long-distance hauling of up to 100,000 pounds of junk cars smashed with a bulldozer on multiple occasions constituted a separate commercial activity rather than a farm use."

Our first observation is that the point overstates the record. The aggregate weight of the three loads shown by the evidence amounted to less than 80,000 pounds.

Our next observation is that the trial court was correct in determining that the term "farm use" is not defined in the policy

and that no Missouri appellate court has spoken on what does or does not constitute farm use within the meaning of such term in a motor vehicle liability insurance policy. The testimony of Farm Bureau's director of underwriting, however, illustrates how the term was understood by Farm Bureau.

The director testified that clearing land for farming would be farm use, so that cutting timber on one's land and using a motor vehicle to haul it away would be covered under a farm use provision in a liability insurance policy applicable to such vehicle. The director further acknowledged that if a farmer had an "old junk tractor" in his field and hauled it away on a motor vehicle, such activity would be covered by a farm use provision. Additionally, said the director, a farmer's use of a motor vehicle to haul hay to his farm for use in his farm operation would be covered by a farm use provision.

The director was requested to assume an "old plow and cultivator" were sitting in Robert's pasture and that Robert decided to sell them as scrap metal, so he loaded them on his tractor-trailer unit and took them to the closest place that would buy them for scrap, which was 180 miles distant. Asked whether a farm use provision would afford coverage during the trip, the director replied: "Looking at the assumption, if those were his own pieces of equipment taken off his premises that were obsolete and that he was in the process of clearing his land for the raising of livestock, these specific items would fall within the definition of farming use of a vehicle and he would be covered." Asked whether use of a motor vehicle for clearing scrap cars from land so that the land could be used for pasture would be covered under a farm use provision, the director answered: "If they were there and the purpose of clearing them off was associated with a non-agricultural related business, they would not be included within the farm activity."

The trial court posed this question: "If you assume the purpose was to clear the pasture land so he could raise more grass by hauling these old cars off and getting

rid of them, would that still be a farm use?" The director responded: "If he's clearing that pasture off and that's the specific and primary motivation, yes. But there again with the assumption of what's being cleared off is a farm-related business or activity."

In its brief Farm Bureau states: "A reasonable person could conclude that three, four, five or six junk cars would be accumulated over a period of time by a farmer and that it could be incidental to his farming that he would elect to move them off of pasture ground. A reasonable person, however, would expect a farmer to load the cars on his farm truck in a manner different from a commercial salvage hauler, that is not squashed flat and that the farmer would take them to town to the junk yard to dispose of them."

We take that passage as a concession by Farm Bureau that the use of a motor vehicle by a farmer to remove a small number of junk cars from pasture ground and haul them to the nearest purchaser would be covered by a farm use provision. Farm Bureau insists, however, that Robert's hauling of three loads of smashed cars aggregating nearly 80,000 pounds and "loaded in a very professional manner is so grossly non-farm that a reasonable fact finder could not without giving an absolutely strained meaning to the term 'farm use' make the finding the trial court did." Farm Bureau proclaims, "Certainly when [Robert] left the farm and embarked for Kansas City he had finished any possible 'farm use' and was embarking on a commercial venture."

The only case cited by Farm Bureau in support of that declaration is *Sunshine Mut. Ins. Co. v. Addy*, 72 S.D. 634, 38 N.W.2d 406 (1949). There, a farmer—Addy—owned a Dodge truck which he used in farming, and another truck which he used in a commercial trucking business. His liability insurance on the Dodge covered only farm use. Addy was notified that a farmer eight or nine miles northeast of his farm had two cattle to be taken to market, and that a farmer south of his

farm had a hog to be taken to market. Addy needed to go to town to get repairs for a combine. He left his farm in the Dodge, picked up the two cattle, and was on his way to get the hog when he was involved in a collision. He argued the Dodge was being operated for farm use, as he was en route to town for tractor parts and would not have made the journey had he not needed them. The Supreme Court of South Dakota disagreed, holding that at the time of the accident Addy had departed from his trip to obtain parts and was on a mission as a commercial carrier, consequently the use of the Dodge at the time of the accident was not a farm use within the insurance coverage. *Id.*, 38 N.W.2d at 407–08[2].

We fail to see how *Sunshine* aids Farm Bureau. In the instant case Robert was not hauling junk for others for hire. Instead, so the trial court concluded, Robert was removing abandoned cars from pasture land in furtherance of a farming operation.

Farm Bureau argues otherwise, underscoring certain inconsistencies in Robert's testimony. At one point in his testimony Robert said he had accumulated the cars in the last five or six years. Elsewhere in his testimony Robert said some cars had been on the tract since he was 16 years old.[1] On one occasion Robert was asked whether one of his considerations in acquiring the cars was their salvage value. He answered, "No." As noted earlier, however, he admitted that once the cars ceased running he kept them because he thought someday they might be worth some money. Additionally, Robert conceded he had made only five applications for motor vehicle titles in the seven years preceding trial. Farm Bureau implies that such evidence demonstrates Robert was hauling the cars in connection with the operation of a motor vehicle salvage business, a commercial activity outside the coverage of endorsement 76.

The trial court, however, was not so persuaded. While Farm Bureau may scoff at Robert's claim that he was clearing the

---

1. *Robert's application for the insurance showed*   he was born in 1947.

tract of old cars so he could use it as pasture, the trial court accepted such testimony as true. That was the trial court's prerogative. Credibility of witnesses and the weight to be given their testimony is for the trial court, *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App.1983), and we may not substitute our judgment for that of the trial court on credibility issues, *Atkins v. Clark*, 644 S.W.2d 365, 369[5] (Mo.App.1982).

Farm Bureau's argument that a farmer clearing his land of junk would ordinarily take it to town and dispose of it at the junk yard ignores the fact that there was no evidence of any buyer any closer than Kansas City. Had there been a market for the junk cars any nearer than Kansas City, Farm Bureau could have adduced such evidence.

The fact that a salvage broker might haul junk cars the same way Robert did does not compel a finding that Robert was operating a salvage business. According to the evidence, Kansas City was the most proximate location for disposition of the cars. It is natural to expect that Robert, or anyone else, would transport the cars there at the least possible cost. Obviously, crushing them so that more could be loaded on the trailer was the most economical way.

We hold the evidence sufficient to support the trial court's conclusion that Robert, on February 20, 1986, was hauling the junk cars off his land in furtherance of a farming operation. The evidence did not compel a finding that Robert, in Farm Bureau's words, was engaged in "a separate commercial activity rather than a farm use." Farm Bureau's first point is denied.

Farm Bureau's second point states:

"The trial court erred in ... [concluding] ... that the failure to define the phrase 'farm use' in the policy made it ambiguous because [Robert] admittedly had no reasonable expectation when he purchased the insurance that it would cover salvage hauling for sale in that only activities included in the plain meaning of 'farm use' were discussed by [Robert] and [Farm Bureau's] agent."

The evidence to which Farm Bureau refers is Robert's testimony that when he applied for the insurance, Farm Bureau's agent said Robert could haul anything that came off his farm that was actually grown on it. Additionally, Robert quoted the agent as saying Robert could haul farm tractors or any kind of equipment that was a farm vehicle. Robert conceded he and the agent never discussed hauling "scrap metal to Kansas City." Robert did, however, recall the agent saying Robert could haul "anything that was involved with the farm."

Farm Bureau correctly asserts that the rule in Missouri is that unless an insurance policy is ambiguous, it must be enforced by the courts as written. *Hempen v. State Farm Mutual Automobile Insurance Co.*, 687 S.W.2d 894, 894–95[2] (Mo. banc 1985). Farm Bureau maintains that the term "farm use" is not ambiguous, hence such term is not to be construed against Farm Bureau.

It has been said that an ambiguity exists when there is more than one reasonable interpretation which can be gleaned from contract language. *Harris v. Union Electric Co.*, 622 S.W.2d 239, 247[8] (Mo.App. 1981). However, as we see it, resolution of the instant appeal does not require a determination of whether the term "farm use" in endorsement 76 is ambiguous.

Appellate courts in other jurisdictions confronted by cases involving similar provisions have not concerned themselves with whether such terminology is ambiguous. Instead, such courts have looked carefully at the use being made of the vehicle at the time in question to determine whether coverage existed under such a provision. Thus, we have seen in *Sunshine*, 38 N.W. 2d 406, that the appellate court held the farmer was on a commercial mission rather than a farm errand at the time of the accident.

In *Jones v. Manufacturer's Casualty Ins. Co.*, 313 Ill.App. 386, 40 N.E.2d 545 (1942), a liability policy on a truck provided coverage when the truck was used for transportation or delivery of goods, mer-

chandise, or other materials, and uses incidental thereto, in connection with the insured's occupation of farming. The insured, on the evening in question, drove the truck from his farm to the residence of his son, where the insured picked up the son and certain members of his family, taking them to another town where they attended a show. After the show, while en route to the son's home, a collision occurred. The insured conceded that at the time of the accident he had no provisions in the truck for the farm, or supplies, or anything of that kind. The trial court held the policy afforded no coverage. The appellate court affirmed, stating that the use of the truck at the time of the collision was not within the coverage. 40 N.E.2d at 548[5]. No effort was made to define "farming."

In *Farm Bureau Mut. Automobile Ins. Co. v. Manson*, 94 N.H. 389, 54 A.2d 580 (1947), a liability policy provided coverage for a truck used in the business occupation of the insured including occasional use for personal, pleasure, family and other business purposes. The insured, who declared his occupation as farmer, leased the truck to the United States under contract for work on an airport. The insured furnished a driver who picked up WPA workers each morning, delivering them to the airport and returning them home at night. One of the workers was hurt alighting from the truck after work. The insurer sought a declaratory judgment that the policy did not cover such incident. The trial court held there was coverage. The appellate court noted that many farmers, as part of their business, did odd jobs with their trucks such as hauling gravel for state roads and various other forms of construction, and that this often included carrying men to and from work. 54 A.2d at 582. The use made of the truck at the time in question, said the opinion, was not so materially different from the purposes stated in the declaration as to defeat coverage. *Id.* The court did not undertake to define "farmer."

In *Martin v. Shepard*, 134 Vt. 491, 365 A.2d 971 (1976), a farm-owners' insurance policy excluded liability coverage for business pursuits of an insured, and defined "business" in the words "excludes trade, profession or occupation, other than farming and roadside stands maintained principally for the sale of the insured's produce." The policy did not define farming. On his farm the insured kept horses, which were regularly bought, sold and traded. Most were show horses, but some were for racing. The latter were raced at agricultural fairs and once at a commercial track. The plaintiff, who trained and raced horses for the insured, was injured while driving one of the insured's horses in a sulky race at a state fair. The plaintiff claimed the insured was negligent in providing improper equipment for the race. The insurer sought a declaration that the incident was not covered by the policy. The trial court found coverage. Reversing the judgment, the Supreme Court of Vermont framed the issue as whether a continued course of racing, off the insured's premises, engaged in on a commercial scale, was encompassed within the term "farming," or was a "trade, profession or occupation other than farming." 365 A.2d at 974. The court concluded it was the latter, observing: "Whatever the status of horse raising, horse racing involves greatly different risks." *Id.* at 975. No definition of farming appeared in the opinion.

■ Applying the principles of the cases discussed above to the trial court's conclusion in the instant case that Robert, at the time of the accident, was hauling the abandoned cars from the tract for the purpose of clearing it for use as pasture in furtherance of his farming operation, we hold that such activity was within the coverage provided by endorsement 76. While Farm Bureau's characterization of such activity as "salvage hauling for sale" may be accurate as far as it goes, such description disregards the trial court's finding that Robert's cargo had been cluttering land he wanted to use as pasture for his cattle and horses. The record demonstrates the most sensible and economically beneficial way to get rid of the junk was to sell it to the dealer in Kansas City. That Farm Bureau may not have foreseen such use of Robert's tractor-trailer is no reason for denying coverage. In *State Farm Mutual Auto-*

*mobile Insurance Co. v. Mid–Continent Casualty Co.*, 378 S.W.2d 232 (Mo.App. 1964), the question of liability insurance coverage depended on whether a motor vehicle accident arose out of the operation of a service station. The opinion said:

> "Whether this accident arose out of the operation of the service station must depend upon the circumstances of the particular case, the nature of the transaction, its connection with the business and whether it can be said to be a natural and necessary incident or consequence of the operation of the service station even though not a foreseen or expected consequence of that operation." *Id.* at 236[3].

In the instant case, clearing land of junk so it could be used as pasture for livestock can reasonably be said to be a natural and necessary incident or consequence of a farming operation, even though perhaps not a foreseen or expected consequence of such operation. Consequently, the trial court's ruling that Robert's use of the tractor-trailer unit at the time of the accident was a farm use cannot be disturbed.

We have not overlooked *Farm Bureau Mut. Automobile Ins. Co. v. Daniel*, 104 F.2d 477 (4th Cir.1939), cited by Farm Bureau. That case, however, involved insurance provisions and facts too different from the instant case to be persuasive.

Farm Bureau's second point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.

### ON MOTION FOR REHEARING

PER CURIAM.

In a motion for rehearing Farm Bureau avers this Court misinterpreted the facts in stating that there was no evidence of any buyer for the junk cars closer than Kansas City. Farm Bureau insists the transcript shows there was in fact a place to sell the cars closer than Kansas City. Farm Bureau bases its argument on the following excerpt from Robert's deposition:

> "Q. There are junk yards closer than Kansas City, aren't there?
> A. Yes."

While the excerpt establishes there were junk yards closer than Kansas City, it does not establish that any of such junk yards would have purchased the large quantity of compressed junk cars Robert was hauling at the time of the accident, and it certainly does not demonstrate that Robert could have obtained as high a price for the load anyplace nearer than Kansas City. Indeed, the trial court was doubtful that the above excerpt constituted an admission against Robert's interest, remarking: "He doesn't have to haul it to the cheapest place."

The motion for rehearing is denied.