**OMAHA INDEMNITY COMPANY,**
**Plaintiff/Respondent,**

v.

**PALL, INC., et al.,**
**Defendants/Appellants.**

**Nos. 58508, 58577 and 58628.**

Missouri Court of Appeals,
Eastern District,
Southern Division.

July 16, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 23, 1991.

Application to Transfer Denied
Nov. 19, 1991.

John L. Oliver, Cape Girardeau, for plaintiff/respondent.

Stephen C. Wilson, Jackson, Albert C. Lowes, Paul V. Gilbert, John P. Bradshaw, Cape Girardeau, Jim S. Green, Sikeston, Kenneth W. Shrum, Marble Hill, Brent Winfield Baldwin, Baldwin, Rutledge & Hess, St. Louis, James Spain, Poplar Bluff, William Loren Syler, Jr., P. Patrick Davis, Cape Girardeau, for defendants/appellants.

REINHARD, Presiding Judge.

Defendant Farm Bureau Town and Country appeals the summary judgment finding it liable for coverage arising out of a traffic accident. Cross-appeals from the same summary judgment have been filed by plaintiffs Omaha Indemnity Company and Cameron Mutual Insurance Company challenging the finding that they are secondarily liable under uninsured motorist provisions. A cross-appeal has also been filed by defendant Progressive Casualty Insurance Company. Defendants Mark Howard, Susan Howard and Sherman Starkey did not appeal the summary judgment. We affirm the judgment of the trial court.

The Howards own a farm which they operate under the name Howard Farms. They also do commercial hauling under a Public Service Commission dump truck permit. One of the requirements of issuance of that permit was that Howard obtain insurance specifically designed to cover commercial trucking operations. Defendant Progressive Casualty issued a policy covering a 1973 Ford dump truck and sent this policy and an amendment to it called "Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement" to the Public Service Commis-

sion. This endorsement and a "certificate of insurance" were P.S.C. requirements for all such permits.

In addition to the truck listed on the Progressive insurance policy, Mark Howard also owned a 1976 Ford dump truck that had been a gift from his father, Vincent Howard, who had used it on his farm before he retired. Prior to the gift, this truck was insured with the Defendant, Farm Bureau Town and Country Insurance Company of Missouri. When Vincent Howard transferred the title of the dump truck to his son he also transferred coverage into his son's name. As Mark Howard already had one dump truck that was used on the farm, he thus had two dump trucks named in Farm Bureau policies and one dump truck named in his Progressive policy. In his deposition he testified that when he bought rock for his own use he hauled it with one of these trucks. The policy written by Farm Bureau included an exclusion called Endorsement No. 76 "Farm Use" which stated:

> In consideration of the premium paid for the policy to which this endorsement is attached, it is understood and agreed that the insured vehicle is to be used exclusively for the farm use of the named insured only. Any use of the vehicle for hire or in connection with any custom farming done by the insured or others, except in the occasional hauling of farm products for neighbors, voids the policy.

Early in 1986 Mark Howard began hauling rock for a highway project nearby. He worked both for the general contractor, Bloomsdale Excavating Company, and for its subcontractor, Fred Weber, Inc. His oral contract required him to provide rock as needed usually with one or two days notice. He used his own commercial dump truck and, on occasion, subcontracted with other truckers who would haul under Howard's PSC permit.

Mark Howard employed Sherman Starkey by the hour as a mechanic. Shortly before the accident, which occurred on September 23, 1986, Starkey had done extensive mechanical repairs on the 1976 truck

that was insured by Farm Bureau. On the day of the accident Starkey, at Howard's direction, took the truck out for a "test drive". Mark Howard testified in his deposition that in order to fully assess the success of the repair the truck needed to be driven loaded. He therefore ordered Starkey to go pick up a load of rock for Weber and deliver it to the job site. On his way to get the rock Starkey made a left turn onto I–55 and was struck by a 1983 Oldsmobile driven by Abernathy. Schreiner and Humes were passengers. Shreiner and Abernathy were seriously injured. All three were employees of the City of Jackson, Missouri and were traveling to Columbia on city business. The Oldsmobile was titled in a corporation owned by Abernathy, Pall, Inc. Abernathy's insurance carrier is the plaintiff, Omaha Indemnity Company. Schreiner's carrier is Cameron Insurance. Starkey was uninsured at the time of the accident.

Howard reported the accident to Farm Bureau which began an investigation. He did not notify Progressive. Farm Bureau decided that the vehicle was not being used as a farm vehicle when the accident occurred. On December 10, 1986, the Company notified Howard by certified letter that the policy was being declared void as of September 23, 1986.

Abernathy and Schreiner made claims, under their uninsured motorist provisions, to their insurance carriers. The clause defining uninsured motorist in Omaha Indemnity's contract included vehicles:

"D: Insured by a bodily injury liability bond or policy at the time of the occurrence, but the insurer denies coverage or is or becomes insolvent."

Cameron, Schreiner's carrier, included a similar definition in his policy. Abernathy and Schreiner claimed that since Farm Bureau had denied responsibility their injuries should be covered under the uninsured vehicle provisions of their policies.

Omaha filed a Petition for Declaratory Judgment against Pall Inc., Abernathy, Schreiner, Humes, City of Jackson, the Howards, Starkey, Vincent Howard, Bloomsdale, Fred Weber Inc., Farm Bureau, Shelter Insurance Company,[1] Progressive and Cameron Insurance Company claiming that the vehicle driven by Starkey was not an uninsured vehicle and asking the court to determine which insurance carrier was responsible for the claim.

A substantial record was created, including depositions of Howard, Starkey and three employees of Farm Bureau. Motions for Summary Judgment were filed by Omaha, Cameron, Bloomsdale, and Farm Bureau. After the issues were argued twice to the Court and an evidentiary hearing was held, the Court issued its Order and Judgment on the Motions for Summary Judgment.

The trial court found that: A) At the time of the accident the 1976 Ford dump truck was being used simultaneously for a commercial and a farm use. Because the farm use policy made no mention of simultaneous use and did not define "farm use" the court held that a "latent ambiguity" existed. It resolved this ambiguity against Farm Bureau. B) The policy written by Progressive covering commercial hauling also covered this accident. C) Since both Progressive and Farm Bureau had denied coverage the uninsured motorist provisions of the policies written by Omaha and Cameron had been triggered. "In the event payments are made by Omaha Indemnity and/or Cameron Mutual, they are entitled to Subrogation against Progressive Casualty and Farm Bureau." D) Neither Fred Weber, Inc., or Bloomsdale Excavating had any liability. E) If coverage is accepted by Progressive or Farm Bureau then Omaha and Cameron would no longer be liable. In addition, the trial court noted that Abernathy and Schreiner "are not entitled to a double recovery and that the defendants/claimants may recover from the uninsured motorist carriers only (after which the carriers may subrogate) or from one or both of the liability carriers only (in which case the uninsured motorist carriers would no longer be liable)." From this

1. Starkey mistakenly believed he had auto liability insurance through Shelter Insurance.

judgment Farm Bureau, Progressive, Omaha and Cameron appeal.

Because the actions of the trial court were taken as a result of summary judgment requests, the same standard of review is applicable to all of the appeals taken. Summary judgment is appropriate when the documents before the trial court, including pleadings, depositions, admissions and exhibits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Signature Pool v. City of Manchester,* 743 S.W.2d 538 (Mo.App.1987).

## I.

 Farm Bureau appeals from the trial court's determination that its "Farm Use" exclusion is ambiguous and that Farm Bureau is liable for at least some portion of the damages from the accident. It argues that the phrase "the insured vehicle is to be used exclusively for the farm use of the named insured only," coupled with the phrase "Any use of the vehicle for hire ... voids the policy" clearly excludes simultaneous use from coverage. First we note that exclusionary clauses in insurance contracts are to be strictly construed against the author. If they are ambiguous, we are compelled to adopt a construction favorable to the insured. *McRaven v. F-Stop Photo Labs, Inc.,* 660 S.W.2d 459, 462 (Mo.App.1983). "The language of a contract is ambiguous when there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations." *Nixon v. Life Investors Ins. Co. of America,* 675 S.W.2d 676, 679 (Mo.App.1984). In addition, the burden of proof is on the insurer to prove that the exclusion applies. *American Family Mutual Ins. Co. v. Brown,* 657 S.W.2d 273, 275 (Mo.App.1983).

Our review of the evidence presented convinces us that the exclusion is not sufficiently clear regarding prohibited activities to justify its enforcement. The confusion surrounding this exclusion is vividly illustrated in the deposition of Farm Bureau's underwriter, Claudia Goodin:

Q. Let me ask it this way: let's say that the guy has gravel on his own farm and he fills up his own dump truck and he is intentionally going to take it down the road and sell the gravel to his neighbor. Then driving from the creek to his neighbor's, he dumps the gravel from there to there and he gets—that would, under your interpretation ... clearly not be covered?

A. Right.

Q. After he has dumped it and gotten the cash in his pocket, he's at his neighbor's now and he's going to drive down and pick up a load of that for himself. Is the trip from his neighbor's to the gravel pit, the chat store, back to his house covered or not covered, or is the whole policy void?

The Witness: It would, in that situation, if a claim arose, it would go to the claims department and they would determine if there was coverage or not. I guess it would depend on the insured's intention. I don't know.

\*　　\*　　\*　　\*　　\*　　\*

Q. Following up on one of the questions that Mr. Oliver asked you, did I understand you that in determining the coverage in an instance where we're talking about commercial use, it would depend upon the intent of the party, of the insured, in the use of the vehicle?

A. Yes.

Q. And if his intent changed in the process of his operation, that the time for the change, of the voiding of the policy, was when his intent changed?

A. In my opinion.

Q. It would have nothing to do then, for example, let's say if the individual never received any money for the particular trip, although let's say the insured thought he was going to get paid for the trip, that would have nothing to do with it, the payment itself?

A. Well, that's a hard question. If he intended to do a job for hire, that would void the policy.

Q. From the time he formed the intent? What I'm trying to get at is when is that policy voided from your understanding?

A. When he actually does it, when he actually—

Q. That is when he completes the action or when he starts the action?

A. I don't know.

Q. In other words, are you telling me it is something that is simply a judgment kind of thing that you, as an underwriter, or a claims man would make after something has come in?

A. I would say so.

Q. Is there any way that a policy holder or an insured would have any way to know what that judgment would be ahead of time?

A. No.

Q. Is there any definition of what "farm use" is?

A. In the endorsement.

Q. And what is that definition?

A. You want me to read the endorsement to you?

Q. No. Just read me the definition.

A. Well, no, I guess it's not. There's no definition in the endorsement.

Q. As you understand it as an underwriter, if I have a policy with you on a farm policy and my neighbor next-door pays me to haul his products down to, lets say, South Cape, am I covered under my policy?

A. No.

Q. Why?

A. Because the use of the vehicle was for hire.

Q. Can I haul farm products for my neighbor?

A. You can on an accommodation basis.

Q. But I can't if he pays me?

A. No.

Q. Let's assume that I say I will do it, and this next Christmas, he brings me a shoulder, saying "That's for hauling." Is that for hire then?

A. I don't know.

Q. My next question was going to be when would it take effect, when I took the product or when he brought me the shoulder?

A. I don't know.

The confusion and uncertainty of the underwriter is echoed in Mark Howard's deposition.

Q. ... did you think that 1976 truck, in your own mind, did you feel that 1976 truck was insured?

A. Yes, I did.

Q. Under the Progressive policy did you think, or did you think it was insured under the Farm Bureau policy? What was your thought?

A. It should have been insured under the Farm Bureau policy.

Q. Did you think on that morning you were using that in connection with your farming operation or in regard to your Public Service permit?

A. The reason that I think the truck should have been was that I was not for hire at the time of the accident. Fred Webber [sic] was not going to pay me to come back with an empty truck....

Q. And according to your own mind processes, once you put something on there and started back—

A. It's for hire.

Thus, according to Farm Bureau's underwriter, only *after the fact* would her company be able to definitively determine whether coverage existed and the decision as to whether the insurance company would pay might depend upon the company's assessment of the insured's state of mind at the time of the occurrence.

Such an indefinite conclusion clearly fails to appraise the insured of the limits of his coverage and may even frustrate his intended purpose for obtaining the insurance. It is interesting to note that this "Farm Use" exclusion has been challenged previously in *Farm Bureau Town and Country Ins. v. Franklin*, 759 S.W.2d 361 (Mo.App. 1988). In that case a farmer was involved in an accident while transporting junk cars to a scrap yard for sale. The evidence showed that all of the cars had been removed from a field on his farm. Farm Bureau had denied coverage because it determined that the amount of scrap cars hauled was too large to be considered a farm use even though the cars had been

removed to create more pasture. Our colleagues of the Southern District held that the hauling constituted a farm use based upon its purpose. *Id.* at 367. We cite this case as further evidence of the ad hoc basis upon which decisions of coverage are made with respect to this exclusion. An insurance policy is a contract designed to furnish protection according to the needs and desires of the insured. Where, as here, the exclusion, as interpreted by the insurance carrier, places such protection in doubt it must be construed against the insurer. *See American Family Mutual Ins. v. Brown,* 657 S.W.2d 273 (Mo.App.1983). The trial court properly granted summary judgment against Farm Bureau.

## II.

■ Progressive Casualty first argues that some of the facts relied upon by the trial court were in dispute and that summary judgment was therefore inappropriate. We disagree. The relevant facts of the accident and of the insurance policies involved in this cause of action are not in dispute. The more relevant question is whether Progressive's usual defenses, such as a different vehicle from that listed on the policy itself, and lack of notice to them by their insured of the accident, are available to it in this case.

■ First, we note that the insurance requirement for the issuance of the dump truck permit issued to Howard are contained in § 390.126, RSMo 1986:

No motor carrier shall operate any motor vehicle on any public highway in this state until after such carrier shall have filed with, and same has been approved by the division, a certificate of any insurance carrier authorized to do business in this state certifying that there is in effect a liability insurance policy or bond in some reliable insurance company in association or other insurer satisfactory to the division ... in such forms and upon such conditions as the division may deem necessary *adequately to protect the interests of the public* in the use of the public highways ... which liability insurance shall bind the obligors thereunder

to make compensation for injuries to persons and loss of or damage to property resulting from the negligent operation of such motor carrier; ... (emphasis added) § 390.126.1, RSMo 1986.

The regulations enacted to interpret this statute require that the insurance company file Form E—Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance, which states that the policy issued "has or have been amended to provide automobile bodily injury and property damage liability insurance covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law of the State...." This Certificate also requires that the underlying insurance policy may not be cancelled without giving the Public Service Commission 30 days notice. Both the Certificate and the Endorsement are issued in the name of Mark Howard but neither list the vehicles covered. The endorsement, Form F, Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement stated:

The certification of the policy ... amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby; *provided only that the insured agree to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.* (Emphasis added). *See* 4 CSR 265–10.030.

Because the insurance coverage issued by Progressive is mandated by statute and because the certification and Endorsement change the coverage, we must analyze the statute itself and give it a construction that will carry out the purpose and intent of the legislature. Special consideration will be given to the problem which the statute was designed to remedy. *Benham v. Cox,* 677 S.W.2d 429, 431 (Mo.App.1984). In addition, a statute is not to be interpreted nar-

rowly if such an interpretation would defeat the purpose of the legislation. *Lastra v. Intercontinental Investments,* 745 S.W.2d 703, 705 (Mo.App.1987).

It is well settled law that statutes such as § 390.126, RSMo.1986, have been designed with the protection of the public as the paramount goal to be achieved. *See,* Annot., Failure To Give Notice, or Other Lack of Co-operation by Insured as Defense to Action Against Compulsory Liability Insurer by Injured Member of the Public, 31 ALR2d 647 (1951). Because the ultimate beneficiary of the insurance will be any third party who is injured, or whose property is damaged by the negligent acts of the insured, the contractual rights of the parties "must yield to the public policy of the State ..." *State Farm Mutual Automobile Ins. Co. v. Andrews,* 789 S.W.2d 144, 146 (Mo.App.1990). So strong is the intent to protect the public that even fraud or misrepresentation at the inception of the policy has long been rejected as an acceptable reason for the avoidance of liability, so long as the insurance is compulsory. *See Aetna Casualty and Surety Co. v. O'Connor,* 8 N.Y.2d 359, 207 N.Y.S.2d 679, 170 N.E.2d 681 (N.Y.1960). Indeed, we have found no case law in Missouri, or in any other jurisdiction with similar statutes, that fails to mention the importance of public protection. *See Riss International Corp. v. Sullivan Lines Inc.,* 684 S.W.2d 33 (Mo. App.1984); *Lowery v. Tucson Diesel Inc.,* 17 Ariz.App. 348, 498 P.2d 160 (1972); *Miller v. State Automobile Association,* 74 N.D. 306, 21 N.W.2d 621 (1946). This unanimous agreement upon the purpose of such laws prevails regardless of the exact wording of the individual statutes.

In *Miller,* for example, the insured was driving a truck not listed on his policy when an accident occurred. While the endorsements required for certification were much more detailed than those in the present case, the statement of public policy remains persuasive:

> If the insurance policy were so conditioned as to exempt the insurer from liability for payment of a final judgment for injury or damage resulting from the actionable negligence of the carrier in cases where the negligence consisted of failure on the part of the owner or operator to comply with the laws of the state or the regulations of the Board relating to the operation of motor vehicles, *then the policy would clearly fail to furnish the protection which the statute requires;* for it is a well-known fact that probably in most cases brought to recover damages for personal injuries or damages alleged to have been caused by the negligence of the operator of a motor vehicle, the act of negligence charged involves, or may be predicated wholly upon, the violation or disregard of some provision of the law of the road, or the failure to have the vehicle properly equipped with the prescribed equipment, such as adequate lights and brakes. *Id.* 21 N.W.2d at 630. (Emphasis added.)

Similarly, in *Briggs v. Burk,* 172 Kan. 375, 239 P.2d 981 (1952), the carrier violated a provision of his policy that restricted him to operations within a radius of one hundred-fifty miles. The court rejected the argument of the insurer that this violation relieved it of liability and repeated that:

> the principal purposes of our statutes pertaining to the regulation of motor carriers of persons and property is to have the motor vehicles operated in such a way as to promote the safety and welfare of the public. *Id.* 239 P.2d at 985.

Further, from the language contained in the endorsement itself we infer that Progressive was aware of the extension of its liability as the endorsement clearly places the duty to reimburse upon the insured should Progressive have to make "any payment ... which it would not have been obligated to make except by reason of the obligation assumed in making such certification." The fact that Progressive realized that it had assumed a new obligation convinces us that not only was it the intent of the legislature to require insurance coverage for *all* vehicles acting as carriers but also that Progressive was aware of that intent when it forwarded Forms E and F to the P.S.C.

Progressive has suggested that even if it were responsible for covering this truck

when it was engaged in a commercial activity, it should not be liable here because the truck was engaged in dual usage and empty at the time of the accident. We disagree. The facts support the finding that this dump truck was simultaneously involved in both a farm use and a commercial use. The fact that the truck was empty does not change this result. Similarly, Progressive's defense that its insured, Mark Howard, had never given them notice of the accident must fail. There is no doubt that this defense would be applicable under certain conditions. *See McNeal v. Manchester Ins. and Indem. Co.*, 540 S.W.2d 113 (Mo.App.1976). In *McNeal*, for example, the insured received notice of suit from the injured parties but took no action. Eventually a default judgment was entered against him. It was at this point that the plaintiffs sought to impose liability against the insurer. *Id.* at 115. Such is not the case here. Progressive received notice of the accident on November 28, 1988, and was thereafter actively defending its interests until the order and judgment was entered on May 25, 1990. The complexity of this matter, with respect to which insurer was liable, suggests that Mark Howard may not have believed he had a duty to notify Progressive. In addition, since even active malfeasance by an insured, where the insurance is compulsory may not invalidate the duty of the insurer to protect the public from commercial tortfeasors, the failure to give notice so long as the insurer is not prejudiced will not negate this duty. The trial court properly found that Progressive was liable under its policy.

### III.

Plaintiffs Omaha and Cameron, both of whom provided insurance to the victims of this accident, appeal the trial court's determination of liability with respect to their uninsured motorist coverage. Specifically they claim error by the court in its determination that since both Farm Bureau and Progressive had denied coverage liability then fell upon Omaha and Cameron.

■ First we note that the minimum provisions of uninsured motorists coverage are mandated by statute, most specifically,

§ 379.203, RSMo 1986, and § 303.190, RSMo 1986. These statutory directives "enter into and form a part of the ... insurance contracts to which they are pertinent as fully as if such provisions were written into the policies." *Billings v. State Farm Mut. Auto. Ins.*, 741 S.W.2d 886, 888 (Mo.App.1987). However, so long as the policy provisions meet the minimum requirements of the law and do not conflict with it, the parties remain free to create the insurance contract of their choice. *Id.* We will enforce the policy as written unless its terms are ambiguous. *Hempen v. State Farm Mut. Auto. Ins. Co.*, 687 S.W.2d 894 (Mo. banc 1985).

■ A substantial portion of the argument in plaintiffs' brief seeks to prove two theories: 1) that Progressive had never "denied" coverage, and 2) that if the liability carriers had denied coverage they had done so wrongfully. We find both of these arguments to be without merit. Plaintiffs' suggestion that some form of formal denial was required places excessive emphasis upon form to the detriment of those victims waiting to be reimbursed for their injuries. Practically, whenever a liability insurer fails to pay and, as in this case, aggressively argues that it has no liability, then coverage has been denied. Were the driver and owner of the dump truck without liability insurance of any kind plaintiffs' duty under its policy provisions would be clear. *Hill v. Seaboard Fire and Marine Ins. Co.*, 374 S.W.2d 606 (Mo.App.1963). Similarly, were the liability insurers insolvent, plaintiffs' obligation would be immediate. *Oliver v. Oklahoma Property and Cas. Ins. Guar. Ass'n.*, 774 S.W.2d 902 (Mo.App.1989).

We see no difference here. By their own policy definitions, plaintiffs elected to treat a driver whose liability carrier denied coverage the same as an uninsured driver. Thus, we consider it reasonable to expect plaintiffs to utilize the same procedures of payment, subrogation, and suit to recover its funds that they would utilize were the tortfeasors uninsured. *See* Annot., Insurance—"Uninsured" Motorist, 26 ALR3d 883 (1969).

■ Similarly, we find no support for the assertion that only a legally valid denial of liability coverage will create an obligation

upon the victim's insurance carrier. *Rister v. State Farm Mut. Auto. Ins. Co.*, 668 S.W.2d 132, 135 (Mo.App.1984).

At first glance, our decisions contained in Parts I and II of this opinion would seem to relieve the uninsured motorist insurance carriers of their liability. Upon closer inspection, however, it becomes clear that such is not the case. It was the original *denial of coverage*, regardless of its legal efficacy, that triggered the obligations of Omaha and Cameron.

### IV.

■ The victims of the accident, Abernathy and Schreiner, have also asserted error by the trial court in their respondent's brief. However, no cross-appeal was filed. While a respondent may attack erroneous rulings of a trial court for the purpose of sustaining a judgment in his favor, *Parker v. Bruner*, 692 S.W.2d 379, 382 (Mo.App. 1985), the general rule is that review is limited to the contentions raised by the appellant. *Id. See also Wiedower v. ACF Industries, Inc.*, 763 S.W.2d 333 (Mo.App. 1988).

Judgment affirmed.

CRIST and AHRENS, JJ., concur.